IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JEAN BLEVINS, | ) CASE NO.  1:20-CV-00023-PAB |
| | ) |
| Plaintiff, | ) |
| | ) JUDGE PAMELA A. BARKER |
| vs. | ) UNITED STATES DISTRICT JUDGE |
| | ) |
| WARDEN HAROLD MAY, | ) MAGISTRATE JUDGE |
| | ) JONATHAN D. GREENBERG |
| Defendant. | ) |
| | ) **REPORT & RECOMMENDATION** |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the Petition of Jean Blevins ("Blevins" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Blevins is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case *State v. Blevins*, Cuyahoga County Court of Common Pleas Case No. CR-15-597731-B.  For the following reasons, the undersigned recommends that the Petition be DENIED.

## I.      Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir.

1

2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011). The state appellate court summarized the facts underlying Blevins' conviction as follows:

> [¶ 3] Jean and his cousin, Barry Blevins ("Barry"), were indicted in a thirteen-count indictment in connection with the October 11, 2014 shooting death of David Garrett ("Garrett"). As is relevant herein, Jean was charged with murder, felonious assault, voluntary manslaughter, involuntary manslaughter, and aggravated assault, all with one-and-three-year firearm specifications, and having a weapon while under disability. Barry pled guilty to a single count of voluntary manslaughter with a three-year firearm specification, and was sentenced to fourteen years of imprisonment.[1] The case against Jean proceeded to a jury trial.

> [¶ 4] The evidence presented by the state of Ohio indicated that Barry and Garrett's family became involved in an ongoing feud since 2006 after Phillip Simpson ("Munchie") and Barry were charged with drug trafficking, and the Garretts believed that Barry cooperated with police. On the night of the shooting, Garrett and various family members went downtown to the Lavish Ultra Lounge to celebrate a birthday.

> [¶ 5] According to the testimony of Garrett's fiancée, Ciara Stewart ("Stewart"), Garrett and Barry became involved in a discussion about Munchie, who was serving time in prison. Stewart asked Garrett to dance with her in order to end his conversation with Barry, but he refused and the discussion became increasingly heated. One of Barry's friends, "Boy George," also attempted to direct Garrett away, and Garrett's uncles and Barry's friends also came over to the area. At that point, the owner of the Lavish Ultra ordered everyone to leave.

> [¶ 6] Stewart went to get her car, but moments later, a huge fight erupted in the parking lot. According to Stewart, Barry and Boy George were assaulting Garrett. Garrett broke free and made his way toward Stewart's car, but before he could get in her vehicle, Jean emerged from a nearby vehicle and tossed something to Barry. Immediately after that, Stewart saw Barry aim and fire a weapon at Garrett, killing him, as shots rang out from both sides of the parking lot. As Stewart exited the car to comfort Garrett, she observed Jean return to his vehicle and drive off, while Barry removed his shirt and fled on foot, still holding the gun.

[¶ 7] Stewart identified Jean in a photo array and again in court. She also testified that video of the parking lot depicted her vehicle and some of the events that transpired in the parking lot. Stewart denied that Barry produced the weapon from his waistband, but she acknowledged that her original statement to police said that he had done so.

[¶ 8] Delonda Holiday ("Holiday") testified that gunshots broke out in the parking lot as she and Stewart went to Stewart's vehicle. Holiday saw Jean, whom she knew prior to the incident, driving a blue car. According to Holiday, Jean got out of a car and gave Barry a gun. There was a hail of gunfire, and Garrett was hit.

[¶ 9] Maurice Thompson ("Thompson") testified that he knew Barry and Jean prior to the shooting. Thompson stated that he was waiting for friends in the parking lot of Lavish Ultra at the time of the incident. He observed a crowd fighting, then saw Jean separate from the crowd and proceed toward a car parked on Cooley Avenue, an adjacent side street. Thompson next observed Jean "return to the ruckus" a few minutes later. After that, there were gunshots. Thompson admitted that he did not witness Garrett being shot, and he also admitted that he first mentioned hearing the gunshots at the Lavish Ultra Lounge during his prosecution in an unrelated case.

[¶ 10] Angel Ortiz testified that his home is located next to Lavish Ultra, and that he has a video surveillance system. After the shooting, Ortiz found a weapon near his garage and called the police. The police obtained the gun and home security video that captured the events in the parking lot of Lavish Ultra.

[¶ 11] Cleveland Police Detective Todd Clemens ("Det. Clemens") testified that he found two Federal .40-caliber Smith & Wesson shell casings on the west side of the parking lot. Four .45-caliber shell casings and four 9 mm shell casings were located on the opposite side of the parking lot.

[¶ 12] Dr. Dan Galita ("Dr. Galita"), a forensic pathologist with the Cuyahoga County Medical Examiner's Office, testified that Garrett died from a single gunshot that penetrated the left side of his chest, toward the back, and lacerated his aorta. The bullet traveled from back to front, and left to right.

[¶ 13] Curtiss Jones ("Jones"), a trace evidence analyst with the Cuyahoga County Medical Examiner's Office, testified that he examined various swabs from Garrett's hands and also examined his clothing. According to Jones,

3

there was no gunshot residue on Garrett's body, indicating that Garrett was shot from a distance of at least five feet. Samples from Garrett's hands were also negative for trace metal detection. The back of Garrett's shirt had a bullet hole from the entrance of the bullet. Blood found in other samples was submitted for further DNA analysis.

[¶ 14] Detective James Kooser ("Det. Kooser"), a firearms examiner with the Cuyahoga County Regional Forensic Laboratory, testified that the weapon recovered in this matter was a Heckler & Koch .40-caliber Smith & Wesson pistol with 13 .40-caliber rounds in the magazine. The bullet recovered during Garrett's autopsy was also .40-caliber, and Det. Kooser determined that it was fired from the Heckler & Koch pistol. The two .40- caliber casings found near the west side of the parking lot were also fired from this weapon.

[¶ 15] Carey Baucher ("Baucher"), a DNA analyst with the Regional Forensic Laboratory, testified that in this investigation, she used the "True Allele" software program for analyzing genotypes in order to determine the statistical probabilities for the profiles found in a mixed sample. According to Baucher, this program performs the mathematical analysis not by using "new math," but by performing more complicated mathematical calculations to deal with mixed samples. Baucher testified that this program had undergone peer review and validation, and was "the best program" for such analyses.2 [Court footnote: The record indicates that in 2017, the state forwarded its DNA analyses to the defense and the defense was granted expert assistance for its own DNA analysis at the state's expense. Later, the defense withdrew a previously filed motion in limine.] According to Baucher, the trigger, muzzle, and magazine of the weapon recovered in this matter contained a mixture of five contributors, and Jean's DNA represented the highest percentage of each the mixture. There was insufficient information to determine if Barry's DNA was on the muzzle and trigger, but his DNA was not on the magazine.

[¶ 16] Barry testified that he had been close friends with Garrett's family. However, after Munchie was arrested for drug possession, the family believed that Barry had served as an informant against him. Over the years, Garrett's family confronted Barry, blaming him for Munchie's imprisonment.

[¶ 17] Barry testified that he saw Garrett at the Lavish Ultra Lounge. As Barry explained that he did not provide information to the police about Munchie, another Garrett relative approached him aggressively. Barry stated that he walked outside to avoid a problem, but the Garrett group followed after him. One family member spat on him, and they began to physically attack him.

4

Barry's friend, Boy George, tried to pull the attackers off of him, but the fight escalated.

[¶ 18] According to Barry, Garrett pulled a gun and began pistol whipping him. At that point, Boy George grabbed Garrett. Garrett aimed his weapon at Boy George, then Barry ran to his car and got his own weapon, and he and Garrett exchanged gunfire. After that, Barry fled and hid the weapon under a bucket in a nearby backyard.

[¶ 19] Barry testified that he used his own weapon, and that Jean was not present during the shooting. However, Barry stated that Jean had once briefly handled his weapon and the magazine for "a minute or two a couple of days before" the shooting. Barry also testified that, in his first statement to police, he falsely stated that he had obtained the weapon by wrestling   it away from one of the Garrett family members during the altercation. Barry stated that he made this false statement because he knew he was prohibited from having a weapon due to his prior drug conviction. Barry also testified that he initially told police that his car had been parked on Cooley Avenue. However, he claimed the car was actually parked in the parking lot of Lavish Ultra Lounge, so the gun was within his reach.

*State v. Blevins*, 2018-Ohio-3583, 2018 WL 4265513, at **1-3 (Ohio Ct. App. Aug. 30, 2018) (footnote omitted).

## II.    Procedural History

### A.    Trial Court Proceedings

On August 3, 2015, the Cuyahoga County Grand Jury indicted Blevins on the following charges: two counts of murder in violation of Ohio Rev. Code §§ 2903.02(A), (B) (Counts One and Two); two counts of felonious assault in violation of Ohio Rev. Code §§ 2903.11(A)(1), (2) (Counts Three and Four); voluntary manslaughter in violation of Ohio Rev. Code § 2903.03(A) (Count Five); involuntary manslaughter in violation of Ohio Rev. Code § 2903.04(A) (Count Six); discharge of a firearm on or near prohibited premises in violation of Ohio Rev. Code § 2923.162(A)(3) (Count Seven); two counts of

5

aggravated assault in violation of Ohio Rev. Code §§ 2903.12(A)(1), (2) (Counts Eight and Nine); and having weapons under disability in violation of Ohio Rev. Code § 2923.13(A)(3) (Count Thirteen). (Doc. No. 7-1, Ex. 1.) Counts One through Nine carried one- and three-year firearm specifications. (*Id.*) Blevins entered pleas of not guilty to all charges. (Doc. No. 7-1, Ex. 2.)

On January 25, 2017, over Blevins' objection, the trial court granted the state's motion to obtain a DNA sample from Blevins for testing. (Doc. No. 7-1, Ex. 5.) The trial court continued the trial at the request of the state to allow time to obtain the results from the DNA sample. (*Id.*)

On April 7, 2017, Blevins moved to dismiss the case, arguing that he had been "severely prejudiced" by the delay in the forensic examiner producing a DNA report. (Doc. No. 7-1, Ex. 7.) In the alternative, Blevins moved for bond to be lowered. (*Id.*) Blevins also raised the issue that he would need funds for an independent DNA analysis of any report issued in the case. (*Id.*) The state opposed the motion, arguing the delay had been caused in large part by Blevins' refusal to allow investigators to obtain a buccal swab and that he had opposed the state's motion to compel his DNA. (Doc. No. 7-1, Ex. 8.)

On April 21, 2017, Blevins moved for a protective order precluding the state from introducing the DNA report because it was produced on April 20, 2017, too close to the April 24, 2017 trial date. (Doc. No. 7-1, Ex. 9.) On May 5, 2017, the trial court granted Blevins' oral motion for a DNA expert at the state's expense. (Doc. No. 7-1, Ex. 10.)

On May 26, 2017, Blevins filed a motion in limine to preclude the DNA report on the basis that it used new technology that had not been properly vetted and verified, and therefore did not qualify as an expert opinion in accordance with the Rules of Evidence. (Doc. No. 7-1, Ex. 13.) However, on June 13,

6

2017, Blevins withdrew his motion in limine and his request for a hearing on his motion in limine, with his counsel conceding that the method was widely accepted and stating that his client preferred to forego the hearing and proceed to trial (Doc. No. 7-1, Ex. 14; Doc. No. 7-2 at 63, 65-74, 80.)  Blevins told the trial court he was unwilling to wait for an independent DNA report or for a Daubert hearing and repeatedly stated his desire to move forward with the trial.  (Doc. No. 7-2 at 71-72, 80, 84-85. 87, 89-90, 100-101.)

The case proceeded to jury trial on June 5, 2017.  (Doc. No. 7-2 at 2.)  On June 14, 2017, the jury returned its verdict, finding Blevins not guilty of murder and voluntary manslaughter, but guilty of both counts of felonious assault, involuntary manslaughter, both counts of aggravated assault, along with the one- and three-year firearms specifications, as well as having weapons while under disability.  (Doc. No. 7-1, Ex. 16-17.)

On June 26, 2017, Blevins moved for judgment of acquittal as to the felonious assault counts and aggravated assault, arguing they were "subsumed" by the involuntary manslaughter count.  (Doc. No. 7-1, Ex. 18.)  The state opposed the motion.  (Doc. No. 7-1, Ex. 19.)

On July 14, 2017, the trial court denied Blevins' motion for judgment of acquittal and motion to dismiss.  (Doc. No. 7-1, Ex. 20.)  The trial court held a sentencing hearing that same day.  (*Id.*)  The parties agreed Counts Three, Four, Six, Seven, and Eight merged for sentencing purposes, and the state elected for Blevins to be sentenced on Count Six (involuntary manslaughter).  (*Id.*)  The parties also agreed the one-year and three-year firearm specifications merged into the three-year specification.  (*Id.*)  The trial court sentenced Blevins to 10 years in prison for involuntary manslaughter, plus the three-year

7

gun specification, and three years in prison on Count Nine, to run concurrently to the sentence on Count

Six, for a total prison sentence of 13 years.  (*Id.*)

On August 30, 2017, the court corrected the sentencing entry *nunc pro tunc* to clarify Blevins was

sentenced for involuntary manslaughter.  (Doc. No. 7-1, Ex. 21.)

**B.     Direct Appeal**

Blevins, through counsel, filed a timely notice of appeal to the Eighth District Court of Appeals.

(Doc. No. 7-1, Ex. 22.)  In his appellate brief, he raised the following assignments of error:

> I.      The jury's verdicts finding Mr. Blevins guilty of felonious assault, involuntary
> manslaughter, aggravated assault, and having a weapon under disability are not
> supported by the manifest weight of the evidence and his conviction of those
> offenses violates his rights to a fair trial and due process as protected by the
> constitutions of the United States and of the state of Ohio.
>
> II.     Jean Blevins was denied his Sixth Amendment right to counsel because counsel
> failed to secure adequate time for crucial pretrial preparation and was ineffective
> as a result.
>
> III.    Jean Blevins [sic] sentence was excessive and unconstitutionally disparate to the
> sentences received by his co-defendants.
>
> IV.     The verdict form on count six (involuntary manslaughter) only supports a
> conviction for a felony of the third degree because the verdict form did not state
> the required finding that the death was the proximate result of committing or
> attempting to commit a felony.[1]

(Doc. No. 7-1, Ex. 23-25.)  The State filed a brief in response.  (Doc. No. 7-1, Ex. 26-27.)

On August 30, 2018, the state appellate court affirmed Blevins' convictions.  (Doc. No. 7-1, Ex.

28.)  *See also Blevins*, 2018 WL 4265513, at *1.

---

[1] On April 11, 2018, Blevins moved to supplement his appeal to include the fourth assignment of error,
which the appellate court granted.  (Doc. No. 7-1, Ex. 24-25.)

8

On September 10, 2018, Blevins filed a motion for reconsideration.  (Doc. No. 7-1, Ex. 29.)  The state filed a response in opposition.  (Doc. No. 7-1, Ex. 30.)  On September 25, 2018, the appellate court denied Blevins' motion for reconsideration.  (Doc. No. 7-1, Ex. 31.)

On October 15, 2018, Blevins, proceeding *pro se*, filed a Notice of Appeal with the Supreme Court of Ohio.  (Doc. No. 7-1, Ex. 32.)   In his Memorandum in Support of Jurisdiction, Blevins raised the following Propositions of Law:

I.      The Jury's Verdicts Finding Mr. Blevins Guilty of Felonious Assault, Involuntary Manslaughter, Aggravated Assault, and Having Weapon Under Disability are not supported by the manifest weight of the evidence and his conviction of those offenses violates his rights to a fair trial and due process as protected by the constitutions of the US and of the state of Ohio.

II.     Jean Blevins was denied his sixth amendment right to counsel because counsel failed to secure adequate time for crucial pretrial preparation and was ineffective as a result.

III.    The Verdict Form on Count Six (involuntary manslaughter) only supports a conviction for a felony of the third degree because the verdict form did not state the required finding that the death was the proximate result of committing or attempting to commit a felony.

(Doc. No. 7-1, Ex. 33.)  The State did not file a response.  (*See* Doc. No. 7-1.)

On December 26, 2018, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac.R. 7.08(B)(4).  (Doc. No. 7-1, Ex. 34.)

9

C.      **Federal Habeas Petition**

On December 24, 2019,[2] Blevins filed a Petition for Writ of Habeas Corpus in this Court and asserted the following grounds for relief:

> **GROUND ONE**:   The jury verdicts of guilty for felonious assault, involuntary manslaughter, aggravated assault, and having a weapon while under a disability, are not supported by the manifest weight of the evidence and the convictions violates [sic] the right to a fair trial and due process as under the Ohio and United States constitution.
>
> > **Supporting Facts**:  Petitioners [sic] convictions in this case do not meet the standard. Petitioner was not the shooter, and witnesses denied that petitioner had any involvement in the incident. However, the jury convicted petitioner for being the shooter. this [sic] decision resulted in a decision that was contrary to, or involved an unreasonable application of clearly established law, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.
>
> **GROUND TWO**:   Petitioner was denied his Sixth Amendment right to effective assistance of counsel where counsel failed to secure adequate time for crucial pretrial preparation.
>
> > **Supporting Facts**:   The jury relied on two pieces of evidence to convict petitioner, eyewitness and DNA. However, the accounts of the eyewitness differed on the stand. Also, it was analyzed using the new true allele technology.
>
> **GROUND THREE**:[3]   Petitioner's sentence was excessive and unconstitutionally disparate to the sentence received by the co-defendant.
>
> > **Supporting Facts**:  The petitioner denied any involvement in the death of the victim. But, the State's own case, the most the jury could have found was

---

[2] Under the mailbox rule, the filing date for a *pro se* petition is the date that a petitioner delivers it to prison authorities. *See Houston v. Lack*, 487 U.S. 266 (1988).  While the Petition herein did not arrive at the Court for filing until January 7, 2020, Blevins states that he placed it in the prison mailing system on December 24, 2019.  (Doc. No. 1 at 16.)  Thus, the Court will consider the Petition as filed on December 24, 2019.

[3] In his Traverse, Blevins agreed with Respondent that this claim was procedurally defaulted for failure to present the claim to the Ohio Supreme Court and withdrew this claim.  (Doc. No. 9 at 10.)

10

petitioner either handed or tossed a gun to the actual shooter. For that, petitioner was convicted of two counts of felonious assault, involuntary manslaughter, two counts of aggravated assault, and having a weapon while under disability. Barry Blevins, the actual shooter, was sentenced to 11-years with a 3_year [sic] gun specification, totalling [sic] 14 years.

**GROUND FOUR**:  The verdict form on count six only supported a conviction for a felony of the third degree because the verdict form did not state the required finding that the death was the proximate result of committing or attempting to commit a felony relating to the involuntary manslaughter.

**Supporting Facts**:  The jury verdict form failed to specify the element and/or find that the death was the proximate result of committing or attempting to comit [sic] a felony. Therefore, petitioner should have only been convicted for a third-degree felony. The decision resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings[.]

(Doc. No. 1.)

On March 4, 2020, Warden Harold May ("Respondent") filed his Return of Writ. (Doc. No. 7.) Blevins filed a Traverse on July 6, 2020.  (Doc. No. 9.)

### III. Exhaustion and Procedural Default

**A.      Legal Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b), (c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir.1990).

11

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice. *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97S.Ct. 2497, 53 L.Ed.2d 594 (1977)). A claim may become procedurally defaulted in two ways. *Id.* First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.; see also Maupin v. Smith*, 785F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[4]  *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731–32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lovins*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally

---

[4] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138–39; *Barkley v. Konteh*, 240 F. Supp.2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.")  This second type of procedural default is often confused with exhaustion.  Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id.*  Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at 138–39.  "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule."  *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error."  *Id.*  Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied.  *See United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219–20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994).  Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different.  *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice."  *See Coleman v. Thompson*, 501 U.S.722, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  *See also Jones v. Bradshaw*, 489 F. Supp. 2d 786, 807 (N.D. Ohio 2007); *Allen v. Harry*, 2012 WL 3711552, at *7 (6th Cir. Aug. 29, 2012).

14

**B.  Application to Petitioner**

In Ground Four, Blevins argues, "The verdict form on Count Six only supported a conviction for a felony of the third degree because the verdict form did not state the required finding that the death was the proximate cause of committing or attempting to comit [sic] a felony relating to the involuntary manslaughter." (Doc. No. 1 at 11.)  Respondent argues that this claim raises a matter of state law that is not cognizable on federal habeas review and maintains that the alleged error of state law is not so egregious as to deny Blevins constitutional due process.  (Doc. No. 7 at 33.)  Blevins disputes cognizability in his Traverse.  (Doc. No. 9 at 11.)

While Blevins frames this claim as a federal constitutional issue in his Traverse (*id.*), he framed this claim solely as a state law issue before the state courts.  (Doc. No. 7-1, Ex. 24, 33.)  As another court in this Circuit recently explained:

> In order to have properly exhausted a federal habeas claim, the substance of the claim must have been presented to the state courts as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citations omitted). Rather, "the legal and factual basis of the claim must be 'fairly presented' to the state courts so that they have an opportunity to remedy the alleged constitutional violation." *Arnold v. Warden, Lebanon Corr. Inst.*, 832 F. Supp. 2d 853, 860 (S.D. Ohio 2011) (citing *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006)).

*Owens v. Perry*, No. 1:17-cv-00105, 2019 WL 6250763, at *8 (M.D. Tenn. Nov. 22, 2019).

Therefore, Ground Four is procedurally defaulted unless there is cause and prejudice to excuse the default, or Blevins demonstrates that failure to consider the claims will result in a fundamental miscarriage

15

of justice. Because Respondent did not raise the issue of procedural default as to Ground Four, Blevins did not address any grounds for excusing the procedural default in his Traverse.

### 1. Cause and Prejudice

The Sixth Circuit has held that cause to excuse the procedural default of a habeas claim may exist if a petitioner's appellate counsel was ineffective in failing to raise the issue. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013); *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004); *Smith v. Ohio, Dept. of Rehab. and Corr.*, 463 F.3d 426, 432 (6th Cir. 2006); *Berry v. Warden, Southern Ohio Corr. Facility*, Case No. 3:14CV2518, 2016 WL 4177174, at *3 (N.D. Ohio Aug. 8, 2016). However, the underlying claim of ineffective assistance of counsel must in and of itself not be in default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (finding unless the state prisoner can satisfy the cause and prejudice standard for the procedurally defaulted ineffective assistance of counsel claim, that claim cannot serve as cause for another procedurally defaulted claim).

However, Blevins failed to exhaust any ineffective appellate counsel grounds in a Rule 26(B) application. *Terry v. Jackson*, No. 16-4330, 2017 WL 5664915, at *2 (6th Cir. July 17, 2017). State law will no longer allow him to pursue these claims. *See id.* "Because [Blevins] is well outside the ninety-day window of Rule 26(B), that claim is itself procedurally defaulted, *see Coleman*, 501 U.S. at 735 n.1, and cannot serve as cause to excuse [his] original procedural default. *See Carpenter*, 529 U.S. at 453." *Id.*

A petitioner's *pro se* status or lack of legal training is insufficient to establish cause to excuse the procedural default of his ineffective assistance of counsel claims. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). As Blevins fails to show cause, the Court need not consider the prejudice prong. *Smith v. Murray*, 477 U.S. at 533–34.

16

2.   **Actual Innocence**

As noted above, a petitioner's procedural default may be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman*, 501 U.S. at 749–50.  In order to establish actual innocence, a habeas petitioner must show "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).  Conclusory statements are not enough—a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324.  *See also Jones*, 489 F. Supp. 2d at 807; *Allen*, 2012 WL 3711552, at *7.  A petitioner must show that, in light of new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *See Schlup*, 513 U.S. at 327.   "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id*. at 316.

Nowhere in his Petition or his Traverse does Blevins state he is actually innocent, nor does he present any new, reliable evidence of his innocence.  (Doc. Nos. 1, 9.)  Therefore, the Court finds Blevins has failed to demonstrate the procedural default of Ground Four should be excused on the basis of actual innocence.

### IV.   **Non-Cognizable Claim**

Respondent argues that Ground Four must be dismissed as non-cognizable since habeas relief does not lie for errors of state law and the alleged error by Blevins was not so egregious as to deny him constitutional due process.

17

In response, Blevins argues, "A state court's evidentiary ruling will riase [sic] to the level of a constitutional violation where it violates a bedrock principle of justice so as to deprive the defendant of a fundamentally fair trial." (Doc. No. 9 at 11) (citation omitted).

It is well established that, in conducting habeas review, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). As such, the Supreme Court has explained "it is not the province of a federal habeas court to reexamine state-court decisions on state-law questions." *Id.* at 67-68. *See also Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Stated another way, a state court's interpretation of state law is binding upon a federal habeas court. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005); *Bibbs v. Bunting*, 1:16-cv-02069, 2017 WL 4083558, at *15 (N.D. Ohio May 17, 2017). *See also Thompson v. Williams*, 685 F. Supp. 2d 712, 721 (N.D. Ohio 2010) (stating "a federal court may not second-guess a state court's interpretation of its own procedural rules.") (citing *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir.1988)). "Federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 765, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). *See also Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.")

Therefore, in addition to being procedurally defaulted, Ground Four is also non-cognizable.

## V. Review on the Merits

**A.      Legal Standard**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v. Warren,* 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Indeed, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S. 901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012).  *See also Lopez v. Smith*, —— U.S. ——, 135 S.Ct. 1, 4, 190 L.Ed.2d 1 (2014) (per curiam)

("Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'" (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.  See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 F. App'x 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence

20

in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id*. at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

    **1.**    **Ground One**

In Ground One, Blevins argues the guilty verdicts are against the manifest weight of the evidence and violate his rights to a fair trial and due process under the Ohio and United States Constitutions.  (Doc. No. 1 at 6.)  Blevins asserts he was not the shooter, and witnesses testified he had no involvement in the incident.  (*Id.*)  However, according to Blevins, "the jury convicted petitioner for being the shooter."  (*Id.*)  Blevins maintains this resulted in a decision that was contrary to or involved an unreasonable application of clearly established law and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  (*Id.*)

Respondent notes that Blevins' grounds for his manifest weight of the evidence claim on habeas review – that he was not the shooter and had no involvement in the incident – differs from that presented to the state courts – that inconsistencies in witness testimony required reversal – and as such the new factual grounds are procedurally defaulted, in addition to being factually incorrect.  (Doc. No. 7 at 18, 23-

21

25.)  With respect to the witness testimony, Respondent asserts the "evidence was sufficient under the *Jackson* standard."  (*Id.* at 23.)

In his Traverse, Blevins maintains Barry Blevins, the shooter, testified he had no involvement in the incident, two other witnesses' testimony had "inconsistencies" that "destroy[ed] their value as evidence," and that the DNA evidence in the case was unreliable.  (Doc. No. 9 at 4-7.)

The record reflects Blevins raised a manifest weight of the evidence claim based one the inconsistencies in witness testimony and the issues with the DNA evidence in the case on direct appeal to both the state appellate court and the Supreme Court of Ohio.[5]  (Doc. No. 7-1, Ex. 23, 33.)  The state appellate court considered this claim on the merits and rejected it as follows:

> {¶ 21} In the first assigned error, Jean argues that his convictions are against the manifest weight of the evidence because the state's key testimony contained accounts that changed over time and were conflicting.

> {¶ 22} In *Thompkins*, the court explained a challenge to the manifest weight of the evidence as follows:

>> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis added.) *Black's* [*Law Dictionary* (6th Ed.1990) 1594]. When a court

---

[5] In his Traverse, Blevins fails to address Respondent's argument that his claim that he was not the shooter, but the jury nonetheless convicted him as the shooter is factually incorrect and procedurally defaulted.  The Court finds Respondent's argument that this claim is factually incorrect is well-taken, as review of the record shows Blevins was tried on an accomplice liability theory.  (*See, e.g.,* Doc. No. 7-7 at 1378-80.)  In addition, this claim is procedurally defaulted, and Blevins fails to show cause and prejudice, or actual innocence, to excuse the procedural default.

of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. [Quoting *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652 (1982) ]. *See also State v. Martin* (1983), 20 Ohio App.3d 172, 175, * * *, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*Id.*, 78 Ohio St.3d at 386.

{¶ 23} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Adhikari*, 2017-Ohio-460, 84 N.E.3d 282, ¶ 48 (8th Dist.), citing *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, and *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *Adhikari*, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21.

{¶ 24} In this matter, Stewart testified that Garrett and Barry were involved in a heated discussion inside Lavish Ultra Lounge, and that once outside, a huge fight erupted in the parking lot. She testified that Garrett broke free from a physical attack, but before he could make it to her automobile, Jean emerged from a nearby vehicle and tossed something to Barry, and Barry then shot Garrett. Stewart's prior statement indicated that Jean pulled the weapon from his waistband. Holiday saw Jean get out of a vehicle and give Barry a gun. Thompson saw Jean separate from the crowd that was fighting, go to a parked car, and return to the fight immediately before shots were fired. Barry maintained that after Garrett pistol-whipped him, he shot his own weapon,

killing Garrett. He stated that Jean was not present but did briefly handle the weapon and magazine on an earlier occasion. Physical evidence indicated that Garrett had not handled a weapon, and he was shot on the left side of his chest toward his back, from a distance of at least five feet. Jean was the major DNA contributor on the trigger, handle, muzzle and magazine of the weapon, and Barry's DNA was not on the magazine.

{¶ 25} From all of the foregoing, and after reviewing the entire record, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice in convicting Jean in this matter. Although Stewart's trial testimony differed from her original statement, and there were other inconsistencies regarding the exact manner in which Jean provided Barry with the weapon, the jury was free to resolve them, and the manner in which they did so is supported by the eyewitness testimony and the physical evidence, including the forensic evidence, DNA analysis, and medical evidence.

{¶ 26} The assigned error lacks merit.

*Blevins*, 2018 WL 4265513, at **3-4.

The Sixth Circuit has construed manifest weight of the evidence claims as sufficiency of the evidence claims on habeas review. *Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (Petition asserted a manifest weight of the evidence claim, not an insufficiency of the evidence claim, but the Sixth Circuit interpreted petition "as a complaint that the state court erroneously found [Petitioner's] conviction to be supported by sufficient evidence."). As the *Nash* court explained:

On appeal to the Fifth Circuit Court of Appeals of Ohio, Nash argued that his conviction for felonious assault was against the manifest weight of the evidence, but he did not literally argue that there was insufficient evidence to support his conviction. Nevertheless, the sufficiency of the evidence issue was adequately passed upon by the Ohio courts because the determination by the Ohio Court of Appeals that the conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence. The Ohio Court of Appeals, for instance, has explained that " '[b]ecause sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency.' Thus, a determination that a conviction is supported

24

> by the weight evidence will also be dispositive of the issue of sufficiency." *State v. Lee,* 158 Ohio App.3d 129, 814 N.E.2d 112, 115 (2004) (citations omitted). Therefore, the district court properly entertained Nash's sufficiency of the evidence claim because it has been effectively presented to the Ohio courts and was decided by the Ohio Court of Appeals.

*Id.* at 765.

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363–64, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In making such a determination, a district court may not substitute its own determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of witnesses. *Id. See also Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983). Moreover, federal courts are required to give deference to factual determinations made in state court and "[a]ny conflicting inferences arising from the record ... should be resolved in favor of the prosecution." *Heinish v. Tate*, 1993 WL 460782, at *3 (6th Cir. 1993) (citing *Walker*, 703 F.3d at 969–70*.) See also Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (the deference owed to the trier of fact limits the nature of constitutional sufficiency review.)

Consistent with these principles, the Supreme Court has emphasized that habeas courts must review sufficiency of the evidence claims with "double deference:"

25

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.  First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.' *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (*per curiam*).  And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, —— , 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012).  Under this standard, "we cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt," nor can "[w]e ... inquire whether any rational trier of fact would conclude that petitioner ... is guilty of the offenses with which he is charged."  *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).  Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial." *Id.* (emphasis in original) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)).

Upon careful review of the trial transcript, the Court finds the state appellate court reasonably determined Blevins' conviction was supported by sufficient evidence.  In resolving Blevins' manifest weight of the evidence claim, the state appellate court accurately summarized the evidence of record and correctly identified the applicable law.  As noted in the state appellate court opinion, Stewart testified that Garrett, her fiancé, and Barry Blevins were involved in a "heated discussion" inside Lavish Ultra Lounge, and once outside, a fight erupted in the parking lot.  (Doc. No. 7-3 at 448-51.)  Stewart further testified

26

that after Garrett broke free from the fight, but before he could make it to her automobile, she saw Blevins get out of a nearby vehicle and toss something to Barry, who then shot Garrett. (*Id.* at 451, 466-70.) Stewart's prior statement to the police indicated that Barry pulled the weapon from his waistband. (*Id.* at 499-505.) Delonda Holiday saw Blevins get out of a vehicle and give Barry a gun. (Doc. No. 7-5 at 736.) Maurice Thompson saw Blevins separate from the crowd that was fighting, go to a parked car, and return to the fight immediately before shots were fired. (*Id.* at 923-25.) Barry testified that after Garrett pistol-whipped him, he ran to his car, got his gun, and shot his own weapon, killing Garrett. (Doc. No. 7-6 at 1032-33.) Barry further testified Blevins was not present, but he had handled the weapon and magazine on an earlier occasion. (*Id.* at 1062, 1075, 1078, 1091, 1094, 1096, 1103.) Barry admitted he had given prior inconsistent statements to the police. (*Id.* at 1045, 1055-56, 1062-64, 1069-70.) Physical evidence indicated that Garrett had not handled a weapon. (Doc. No. 7-4 at 645.) Blevins was the major DNA contributor on the trigger, handle, muzzle, and magazine of the murder weapon, and Barry's DNA was not on the magazine. (Doc. No. 7-6 at 1154-55, 1158-60, 1162-65, 1188-89.)

While Blevins asserts there was insufficient evidence based on his view of Stewart and Holiday's credibility and the inconsistencies of their testimony, it is not for this Court to weigh evidence or determine credibility. *See Jackson*, 443 U.S. at 317-19; *Coleman*, 566 U.S. at 651. While Blevins interprets evidence in a light most favorable to him, that is not the standard – the Court must view the evidence in a light most favorable to the prosecution. *Jackson*, 443 U.S. at 319.

There is no basis for this Court to conclude that the state court decision in this case involved an unreasonable determination of the facts or was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, it is recommended the Court find Ground One lacks merit.

### 2.      Ground Two

In Ground Two, Blevins argues he received ineffective assistance of counsel where trial counsel "failed to secure adequate time for crucial pre-trial preparation."  (Doc. No. 1 at 8.)  Blevins argues that trial counsel failed to request additional time to challenge the DNA evidence that the jury relied on in convicting him.  (Doc. No. 9 at 9-10.)

Respondent argues the state court of appeals' decision involved a reasonable application of the *Strickland* standard, as counsel's decision to cross-examine the state's expert without securing a defense expert or holding a *Daubert* hearing was a reasonable strategy in light of counsel's concession that the DNA technology had already been accepted by the trial court and Blevins' repeated statements that he wanted to move forward with the trial and was unwilling to wait for an independent DNA report or a *Daubert* hearing.  (Doc. No. 7 at 26-27.)

The record reflects Blevins raised this ineffective assistance of counsel claim to both the state appellate court and the Supreme Court of Ohio.  (Doc. No. 7-1, Ex. 23, 33.)  The state appellate court considered these claims on the merits and rejected it as follows:

> {¶ 27} In the second assigned error, Jean argues that his trial counsel was ineffective for failing to request a continuance for additional DNA preparation, and proceeding to trial without a defense DNA report.
>
> {¶ 28} We review a claim of ineffective assistance of counsel under a two-part test that requires the defendant to demonstrate: (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
>
> {¶ 29} In evaluating the alleged deficiencies in performance, our review is highly deferential to counsel's decisions because there is a strong presumption

28

that counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, 538 N.E.2d 373, citing *Strickland* at 689, 466 U.S. 668, 104 S.Ct. 2052. Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts are to refrain from second-guessing the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Debatable trial tactics generally do not constitute a deprivation of effective counsel. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 278.

{¶ 30} To show prejudice, a defendant must prove that the lawyer's deficiency was so serious that there is a reasonable probability the result of the proceeding would have been different. *Strickland* at 694, 466 U.S. 668, 104 S.Ct. 2052.

{¶ 31} With regard to whether counsel committed an error in failing to obtain a defense DNA report, we note that the Ohio Supreme Court has held that the failure to call a defense DNA expert and to instead rely on cross-examination does not constitute ineffective assistance of counsel. *State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993), citing *State v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987). Counsel's decision to rely on cross-examination of the state's DNA expert may be a legitimate tactical decision because the results of defense DNA testing might not have turned out to be favorable to the defense. *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 97; *State v. Hartman,* 93 Ohio St.3d 274, 299, 2001-Ohio-1580, 754 N.E.2d 1150.

{¶ 32} With particular regard to True Allele, we note that this program was accepted in *State v. Mathis*, Cuyahoga C.P. No. CR-16-611539-A (Apr. 13, 2018). *See generally People v. Wakefield*, 47 Misc.3d 850, 9 N.Y.S.3d 540 (Sup. Ct. Schenectady, 2015) (compilation of cases accepting True Allele).

{¶ 33} In this instance, during his pretrial preparation, defense counsel obtained the data relied upon by the state and was also granted funds for a defense expert. He filed a motion in limine and also requested an admissibility hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Shortly before commencement of trial, however, defense counsel stated that he did not obtain a final expert DNA report. He stated that the True Allele program had been accepted by the court, and that numerous challenges to it were rejected, so he withdrew the *Daubert* challenge. At that point, the court asked Jean if he concurred with counsel's decision and Jean stated, "[t]hey got my DNA, they got my DNA.

29

> Not just going to keep fighting it." During trial, defense counsel extensively cross-examined Baucher about her DNA findings, her use of True Allele, and the conclusions set forth in her report. Further, counsel's approach reconciled Baucher's conclusions with Barry's testimony that Jean briefly handled the weapon and magazine but did not fire the weapon.
>
> {¶ 34} From the foregoing, we find no trial error under *Strickland*. Defense counsel may have reasonably concluded, as a legitimate tactical decision, that it was futile to challenge the state's DNA findings. *Foust*, 105 Ohio St.3d 137 at ¶ 125, 823 N.E.2d 836. Moreover, in light of Jean's acknowledgment regarding the DNA, we find no prejudice.
>
> {¶ 35} The second assigned error lacks merit.

*Blevins*, 2018 WL 4265513, at **4-6.

In order to establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution.  *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id*.  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Mere

30

disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a

claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a

petitioner's counsel was a matter of strategy.  *Id.* at 689.  *See also United States v. Perry*, 908 F.2d 56, 59

(6th Cir. 1990).

> As explained by the United States Supreme Court:

> > Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ——, 129 S.Ct. 1411, 173 L.Ed.2d 251.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Harrington*, 562 U.S. at105.  *See also Kennedy v. Warren*, 428 F. App'x 517, 520 (6th Cir. 2011); *Phillips*

*v. Sheldon*, 2014 WL 185777, at **14-15 (N.D. Ohio Jan. 16, 2014).

Here, the Court finds the state appellate court reasonably determined trial counsel was not

ineffective for failing to request a continuance for additional DNA preparation and proceeding to trial

without a defense DNA report.  First, as trial counsel recognized, courts had found the True Allele

technology acceptable in other cases.  (Doc. No. 7-2 at 68, 77-78, 82.)  Second, trial counsel engaged in

rigorous cross-examination of the forensic expert regarding her report, the DNA evidence, and the True

Allele technology.  (Doc. No. 7-6 at 1170-86, 1189-90.)  Third, Blevins repeatedly insisted on the record

before the trial court that he did not want to wait for an independent DNA report to be prepared or for a

*Daubert* hearing to be held. (Doc. No. 7-2 at 71-73, 85, 89-90.) As Blevins stated, "They got my DNA, they got my DNA. Not just going to keep fighting it." (*Id.* at 85.) Furthermore, Blevins told the trial court he understood that without the motion in limine, he "could be convicted, that I could probably be convicted," but he still wanted to proceed without a *Daubert* hearing. (*Id.* at 87.) That was still the case even if Blevins' own expert only needed two weeks from the date of receipt of the relevant DNA information to prepare an independent report. (*Id.* at 100-03.) In light of the possible futility of a *Daubert* hearing since the trial court had deemed the technologically scientifically acceptable in another case, coupled with Blevins' strong opposition to any continuance of his trial date, it was reasonable for the state court of appeals to determine trial counsel's decision to forego an independent DNA expert report and a *Daubert* hearing, may have been a reasonable trial strategy, and that in light of Blevins' acknowledgment of his DNA, there was no prejudice.[6]

As the Supreme Court made clear in *Harrington*, "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." 562 U.S. at 105. Under this deferential standard, the Court finds the state appellate court reasonably determined trial counsel was not ineffective for failing to request a continuance for additional DNA preparation and proceeding to trial without a defense DNA report. It is therefore recommended Blevins' second ground for relief be denied.

---

[6] While the Court acknowledges trial counsel stated at one point that he thought Blevins should proceed with a *Daubert* hearing (Doc. No. 7-2 at 80), even if that were sufficient to show ineffectiveness of trial counsel, it does not affect the state court's reasonable determination that Blevins acknowledged the State had his DNA and therefore there was no prejudice.

## V.     Conclusion

For all the reasons set forth above, it is recommended that the Petition be DENIED.


Date: June 23, 2022                            *s/ Jonathan Greenberg*
                                               Jonathan D. Greenberg
                                               United States Magistrate Judge


### **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**